**E-FILED**
Thursday, 20 March, 2008  09:27:14 AM
Clerk, U.S. District Court, ILCD

# IN THE UNITED STATES DISTRICT COURT
# FOR THE CENTRAL DISTRICT OF ILLINOIS
# SPRINGFIELD DIVISION

| | | |
|---|---|---|
| DIANNA MALCOM, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No.  05-3238 |
| | ) | |
| GREG SEIPEL, ERIC HOBBIE, | ) | |
| ALISHA ANKER, and SCOTT | ) | |
| NORRIS, | ) | |
| | ) | |
| Defendants. | ) | |

## OPINION

JEANNE E. SCOTT, U.S. District Judge:

This matter is before the Court on a Motion for Summary Judgment (d/e 43) filed by Defendants Greg Seipel, Eric Hobbie, Alisha Anker, and Scott Norris.  Plaintiff Dianna Malcom is employed as an Operator Trainee III by the Department of Public Utilities (Department) of the City of Springfield, Illinois (City).  Malcom filed the instant four-count Complaint (d/e 1) under 28 U.S.C. § 1983 against Defendants, four Department employees, individually and in their official capacities.  Malcom asserts that the Defendants denied her equal protection when they subjected her, but not similarly situated male employees, to adverse employment actions.

1

Defendants seek summary judgment on all of Malcom's claims.  For the reasons set forth below, the Motion for Summary Judgment is allowed.

BACKGROUND

Malcom is employed in the Department's Electric Operations Division as an Operator Trainee III with Relief Status.  Positions within the Electric Operations Division include trouble clerks, dispatchers, troubleshooters, system operators, and operator trainees.  The instant case deals primarily with the system operator and operator trainee positions.  System operators issue orders to field personnel to facilitate work done in the field on the Department's electric distribution system.  Operator trainees are training to become system operators.  The parties dispute the existence of an intermediary position titled "relief system operator."  Defendants concede, however, that a designation of "Operator Trainee III with relief status" exists.  <u>Defendants' Reply to Memorandum of the Plaintiff, Dianna M. Malcom, in Opposition to the Defendants' Motion for Summary Judgment (d/e 49) (Defendants' Reply)</u>, p. 1.  The parties agree that the duties of an operator trainee with "relief status" fall between those of an Operator Trainee III and a system operator.  The record also reflects that a limited number of system operator positions exist at the Department and that when

an operator opening exists, it is "normally filled by an individual who was the relief system operator." Plaintiff's Memorandum in Opposition to the Defendants' Motion for Summary Judgment (d/e 47) (Plaintiff's Opposition), Attachment 4, p. 3, Deposition of Bill Beers, p. 11-12.[1]

Defendants concede that an Operator Trainee III with relief status "may have the same duties and responsibilities as the system operator" and "may work alone or with another Operator Trainee III with relief status on certain shifts." Defendants' Reply, p. 3, Response to Plaintiff's Additional Fact No. 5. Additionally, Defendants do not dispute that an Operator Trainee III with relief status generally performs two separate functions: (1) filling in for a system operator who is absent from work and (2) going into the field to check jobs for completeness and accuracy. Plaintiff's Opposition, p. 4, Additional Undisputed Fact No. 6; Defendants' Reply, p. 3, Response to Plaintiff's Additional Fact No. 6 (disputing only the job

---

[1]The Court notes that the parties have failed to label their exhibits on their face, although Plaintiff's Opposition does contain an Appendix which assigns attachment numbers to her exhibits. See Plaintiff's Opposition, Attachment 1, Appendix. However, because the Appendix itself is categorized as an attachment in the Court's electronic filing system, the numbers assigned by Plaintiff do not correspond with the numbers assigned by the electronic filing system. With respect to Defendants' exhibits, the Court notes that some electronic attachments contain multiple exhibits. For clarity and consistency, the Court will cite to both Plaintiff's and Defendants' exhibits by the attachment number and page number assigned by the Court's electronic filing system.

title).  Defendants further concede that an Operator Trainee III with relief status "receives higher hourly pay when doing the work of a system operator."  Plaintiff's Opposition, p. 4, Additional Undisputed Fact No. 6; Defendants' Reply, p. 3, Response to Plaintiff's Additional Fact No. 6 (disputing only the job title).  Specifically, when an Operator Trainee III is working as a system operator, he or she is paid at the system operator rate. Effective December 17, 2003, the applicable Collective Bargaining Agreement mandated an hourly rate of $30.3718 for Operator Trainee III and an hourly rate of $ $31.6871 for system operator.  Defendants' Reply, Attachment 4, p. 5.

Malcom began employment with the Department as an Operator Trainee I on February 24, 1997.  She later advanced to the positions of Operator Trainee II and Operator Trainee III.  Malcom asserts that she completed her training in September 1998, and at that point became a "Relief System Operator."  Plaintiff's Opposition, Attachment 2, Affidavit of Dianna Malcom (Malcom Aff.), ¶ 3.  According to Malcom, at the point she was granted relief status; she was fully trained and qualified to perform the work of a system operator.  Id.  Malcom testified in her deposition that, when an individual becomes an Operator Trainee III, there is a six month

testing period to become a designated relief system operator.  Malcom explained that an Operator Trainee III does not necessarily get to work as a relief system operator.  Defendants' Memorandum of Law in Support of Motion for Summary Judgment (d/e 44) (Defendants' Memorandum), Attachment 3, p. 18, Deposition of Dianna Malcom, p. 7.  Without relief status, an operator trainee is unable to execute orders without having someone else review them.  Malcom testified that the orders would usually be reviewed by either "the training committee or the operator that [the trainee is] working with."  Defendants' Memorandum, Attachment 3, p. 21, Deposition of Dianna Malcom, p. 24.

It is undisputed that Malcom experienced no problems as she went through her training program.  Defendants' Memorandum, p. 1, Undisputed Fact No. 2; Plaintiff's Opposition, p. 2.  It is also undisputed that, when Malcom first gained relief status, she got along well with her supervisors and the system operators and dispatcher with whom she worked.  According to Defendants, Malcom "did not serve on a full time basis as a system operator because there was not a permanent vacancy in said position for her to fill."  Defendants' Reply, p. 6, Response to Plaintiff's Additional Fact No. 16.  Defendants further assert that Operator Trainee IIIs with relief status

remain under the supervision of a Training Committee.

The Training Committee is made up of dispatchers and system operators.  The dispatchers represent management, while the system operators are union representatives.  Defendant Hobbie testified that the Training Committee provides oversight to operator trainees as they progress toward system operator status.  According to Hobbie, it is the duty of the Training Committee to ensure that the trainees are working at a proficient level.  To do so, the Committee solicits "feedback from the coworkers which include operators and dispatchers to see that their work level is adequate, that they can progress and to insure that the trainees are working at a safe level to perform the work required of electric system operator." Defendants' Memorandum, Attachment 2, p. 31, Deposition of Eric Hobbie, p. 16. According to Hobbie, it is the Training Committee that grants relief status to a trainee after it is determined that the individual has the competency to sit in for a system operator.  Defendants' Memorandum, Attachment 2, p. 32, Deposition of Eric Hobbie, p. 17-18.  When an Operator Trainee III with relief status is filling in for a system operator, he or she has the same powers, duties, and responsibilities as a system operator and may perform system operator work without being supervised by a system operator.

In 2002, Malcom began an intimate relationship with Paul Moore, a supervisor in another unit at the Department.  Moore was married.  In October 2002, Malcom's supervisor informed her that Moore's wife had been calling the system operator telephone line and making impolite comments about Malcom and her relationship with Paul Moore.  Shortly after Thanksgiving 2002, Moore's wife began persistently calling Malcom's home, making impolite comments to Malcom and Malcom's teenage daughter.  As a result of these calls, Malcom did not sleep or eat well in late 2002 and early 2003.  Malcom created a written timeline of events concerning this time period in which she acknowledged that her "actions (on personal time) caused problems that carried over into work and caused problems at home."  Defendants' Memorandum, Attachment 5, p. 1, Exhibit 1.

According to Malcom, in 2003 and 2004, two other individuals, Tim Brown and Bob Brandon, were serving as relief system operators with her.  Malcom asserts that Brown and Brandon, both of whom are male, completed their training and attained relief status after she did, making Malcom senior to both men under the applicable collective bargaining agreement.  In February 2003, Malcom was called into her supervisor's

office and criticized for a switching order that she had written that was mistaken.  Brandon executed the order, which resulted in a power outage.[2] The supervisor indicated that both Malcom and Brandon would receive a verbal warning concerning the incident.  Malcom asserts that the supervisor suggested that she "step back and not work as a system operator for two weeks."  Plaintiff's Opposition, p. 7, Additional Undisputed Fact No. 22. Defendants contend that Malcom took herself off shift and relief status. Defendants' Reply, p. 7, Response to Additional Undisputed Fact No. 22. This assertion is consistent with Malcom's Affidavit, which avers that the supervisor "suggested that [she] agree to step back and not work as a system operator for two weeks" and that she subsequently "stepped back."  Malcom Aff., ¶ 14.  Malcom's written timeline indicates that she made mistakes on two different orders and that she "was devastated over [her] mistakes." Defendants' Memorandum, Attachment 5, p. 1, Exhibit 1.  According to Malcom, she was "having a nervous breakdown; and was suffering from a deep depression."  Id.  It is undisputed that Brandon filled the position

---

[2]According to Malcom, the general practice is for a system operator to prepare an order and then sign his or her name to it prior to issuing it.  She asserts that it is common, however, for an order to be drafted by one system operator and issued by a system operator on the following shift.  The operator who issues the order signs it, even if it had been prepared by an operator on an earlier shift.  The issuing operator is responsible for the order and is expected to review it prior to issuing it.

vacated when Malcom stepped back.  According to Defendants, Brandon was the next senior Operator Trainee III with relief status.

Shortly after the incident with her supervisor, Malcom took a medical leave of absence for approximately three weeks during which time she participated in a partial hospitalization program to treat symptoms of depression.  According to Malcom, the symptoms of depression began during the time period that she was receiving telephone calls from Moore's wife.  Malcom asserts that, when she returned from the medical leave, she was not allowed to fill in for system operators.  Defendants contend that this was because Malcom no longer had relief status after she stepped back and took herself off relief status.

Malcom concedes that, when she returned from her medical leave of absence, she made several mistakes that were brought to her attention. Defendants' Memorandum, p. 3, Undisputed Fact No. 18; Plaintiff's Opposition, p. 2.  During the second week of April 2003, Malcom was summoned before the Training Committee.  In April 2003, Defendants Anker and Norris sat on the Training Committee along with three other individuals.  Defendants' Memorandum, Attachment 1, p. 7, Affidavit of Mark Dannenberger, ¶ 5.  During that meeting, the committee discussed an

error that Malcom had made but corrected before the order in question was executed.  Malcom went before the committee again in late April 2003, during which time another mistake which had been corrected before execution was discussed.  At that time, the committee held Malcom back from relief status for an additional two weeks.  Malcom asserts that, in early May 2003, her supervisor informed her that the Training Committee had met and was of the consensus that she was not ready to return to work as a system operator.  According to Malcom, the supervisor said that the committee based this decision on the fact that Malcom had yelled at her teenage daughter during a telephone call.

In early June 2003, Malcom was returned to relief status.  According to Malcom, during March and April 2003, both Brown and Brandon made mistakes that were similar to hers, but neither was removed from relief status.  Malcom asserts that Brown received a warning in September 2003 for an incident that occurred on August 25, 2003.  Defendant Hobbie became the manager of the Department's Electric Operations Division, and thus Malcom's supervisor, in October 2003. Malcom asserts that, shortly thereafter, Brown made a mistake relating to the White Oaks Mall substation which Malcom discovered and corrected.  In late October 2003,

Brown called Malcom's attention to a mistake that she had made in a live line clearance order.  In a November 2003 Training Committee meeting, Brown and Malcom's October 2003 mistakes were discussed, but neither was disciplined for those mistakes.  According to Hobbie, the Training Committee spoke to the three Operator Trainee IIIs as a group and then individually.  According to Hobbie, when the committee was discussing Malcom's mistake with her, she expressed concern over Brown's October 2003 error, which she had discovered, and wanted to know if he would be disciplined for it.  Malcom further asserts that Brown was disciplined after November 3, 2002, for "heating up a clearance," and in December 2004, for issuing a switching order that resulted in a power outage.  Plaintiff's Opposition, p. 11, Additional Undisputed Fact Nos. 42, 43.

From June 2003 through February 2004, Malcom worked as a system operator, filling in for system operator Steve Duke, who was on a special assignment for the Department.  Other than the November 2003 meeting, Malcom was not called before the Training Committee during this time period.  According to Malcom, during the November 2003 Training Committee meeting, Hobbie indicated that she might be filling in for Duke for as much as another year.  Malcom asserts that, accordingly, she had

scheduled medical appointments and other commitments based on her belief that she would be working Duke's schedule.  In late January 2004, Malcom heard rumors that Duke might be returning to work as a system operator.   Malcom e-mailed Hobbie to ask whether Duke would be returning and if so, asked that she be given thirty days lead time prior to her work schedule being changed.   Defendants point out that there is no requirement for a thirty day notice in such situations under the applicable Collective Bargaining Agreement.

During late January 2004, Malcom worked the 1:00 p.m. to 9:00 p.m. shift in Duke's system operator position.   On January 18, 2004, when Malcom was working, the National Football League playoff games were on television.  In the early evening, Malcom received telephone calls regarding a power outage in the Val-E-Vue subdivision in Springfield.  Malcom asserts that she fielded well over one hundred calls during the several hours that the power was out to the subdivision.  Defendants dispute this, pointing out that there are only forty customers in the Val-E-Vue subdivision.  The Court must, however, view the evidence in the light most favorable to Malcom at summary judgment.

As is typically done when a customer calls about a power outage,

Malcom prepared a complaint ticket relating to the Val-E-Vue outage.  A complaint ticket identifies the name of the customer, the time the complaint was received, the steps taken to correct the problem, and the times that the various steps were completed.  The field work on the Val-E-Vue incident was completed pursuant to a "running order."  A running order is used in emergency situations to speed recovery of the system or to save people or equipment.  According to Malcom, as a running order is being executed, "someone in the field communicates what has been completed and [the system operator] record[s] it."  Malcom Aff., ¶ 33.  Malcom further avers that, because running orders usually occur in situations where employees are attempting to restore power quickly, employees "do not fully record all information in the running order."  Id.  The record reflects that, generally, a notation of a completed time is required to give clearance on a distribution line operating order, regardless of whether it is a running order.  However, the record shows that "[i]n a severe emergency situation there may not be a time on a distribution order but there will be a time on a clearance that shows the line is actually clear."  Defendant's Reply, Attachment 2, p. 28, Deposition of Gerald Stone (Stone Dep.), p. 21-22.

   According to Malcom, approximately one week after the Val-E-Vue

incident, Defendant Norris, a system operator, told her that he had reviewed her paperwork from the incident and noticed that the times on the running order were different than the times on the complaint ticket. Malcom avers that Norris told her that the times should be the same. Malcom Aff., ¶ 35.  According to Malcom, she informed Norris that she would fix the paperwork on her next occasion at work so that the times would be the same.  Malcom avers that Norris "never indicated to [her] that making the change was improper or contrary to policy."  Id.  Additionally, Malcom asserts that she was not aware from her training that such a change would be improper.  On her next scheduled work day, Malcom modified the running order to conform with the times on the complaint ticket.  According to Malcom, she informed Norris, who responded, "that was fine since the times needed to match."  Id.  Norris sets out a different version of these facts; however, at this point, the evidence must be viewed in the light most favorable to Malcom.  See Defendants' Memorandum, Attachment 2, p. 3-6, Deposition of Scott Norris, p. 33-51.  It is undisputed, however, that Norris subsequently spoke to both Seipel and Hobbie about the paperwork incident.  Defendants' Memorandum, Attachment 2, p. 7, Deposition of Scott Norris, p. 54-55.

On February 4, 2004, Malcom was scheduled to work at 1:00 p.m., but she was ill and took the first four hours off as medical leave. She arrived at work at 5:00 p.m. Normally, Hobbie would leave work at approximately 4:30 p.m; however, on February 4, 2004, he was at work when Malcom arrived at 5:00 p.m. When Malcom arrived, Hobbie handed her a memorandum informing her that Duke was returning to work as a system operator. The memorandum stated that Malcom could remain on Duke's work schedule for two weeks. According to Malcom, this created a hardship for her because she would have to reschedule appointments. Malcom asserts that she was upset with Hobbie and did not understand why he would not give her the thirty days lead time. Hobbie informed her that she could have two weeks on the same schedule, working as an Operator Trainee III, or could return to the normal rotation immediately, which would allow her to fill system operator vacancies on the schedule. Malcom told Hobbie that she was not prepared to give him an answer at that time. Hobbie avers that, during the conversation, Malcom became extremely upset, made claim that Hobbie "had orders to get her," and refused to speak to Hobbie about work matters without an attorney. <u>Defendants' Reply</u>, Attachment 1, p. 2, <u>Affidavit of Eric Hobbie</u>, ¶ 8.

According to Malcom, the conversation lasted approximately five minutes and, at its end, Hobbie left for the day.  Malcom then worked the remainder of her shift, which she characterized as uneventful, as a system operator.  Malcom asserts that she was the only system operator on the shift.  Defendants point out, however, that Brandon was working during this time as an Operator Trainee III with relief status and had served as the system operator from 1:00 p.m. to 5:00 p.m. while Malcom was on leave.  According to Hobbie, prior to leaving he asked the dispatcher on duty, Bill Beers, to monitor Malcom's behavior on February 4, 2004.  In the Division of Electric Distribution, dispatchers serve as shift supervisors.  Hobbie further avers that no crews were working that evening and he did not anticipate activity that would require actions by Malcom.

According to Hobbie, he was concerned about Malcom's erratic and irrational behavior and spoke to Seipel about his concerns.  The decision was made to place Malcom on administrative leave pending a fitness for duty examination.  It is undisputed that the decision to place Malcom on administrative leave was made jointly by Seipel and Hobbie.  Plaintiff's Opposition, p. 22-23, Additional Material Fact No. 106; Defendants' Reply, p. 32.

16

According to Malcom, she was at home sick with a stomach disorder on February 6, 2004, when Hobbie insisted that she come in to work. When Malcom arrived, Hobbie presented her with a memorandum, dated February 6, 2004, placing her on administrative leave. Plaintiff's Opposition, Attachment 13, p. 5, Exhibit 5. According to the memorandum, Malcom's work location was reassigned to her home until further notice. The memorandum indicated that a copy of the work schedule was attached and informed Malcom as follows: "You will be expected to be at your home during the normal work hours and be available for any work assignments." Id. The memorandum expressly defined normal work hours as the shift hours assigned on the schedule. The memorandum noted that the reassignment would be accompanied by Malcom's standard pay and benefits. The memorandum informed Malcom that a fitness for duty examination had been scheduled for her on Wednesday, February 11, 2004, at 2:00 p.m. with a city physician, Dr. Sunil Bansal. According to the memorandum, Hobbie was asking Malcom to sign a form authorizing the release of medical information that would be submitted to Dr. Bansal. The memorandum further informed Malcom that she had been referred to the City's Employee Assistance Program and as a result was scheduled to meet

with Kevin McAvoy on Monday, February 9, 2004, at 11:00 a.m.

The February 6, 2004, memorandum is silent as to the reasons Malcom was being sent to a fitness for duty examination.  Upon receiving the memorandum, Malcom asked Hobbie why she was being placed on administrative leave.  Malcom asserts that Hobbie told her that it was because he noticed her hands shaking during their February 4, 2004, conversation and because Norris had informed him that she had changed the times on the Val-E-Vue running order.  Defendants dispute this, asserting that Malcom was placed on administrative leave for the reasons set out by Hobbie in an April 7, 2004, memorandum, which the Court will discuss infra.  See Defendants' Memorandum, Attachment 5, p. 39, Exhibit 15.  Again, the Court must view the evidence in the light most favorable to Malcom, and furthermore, Defendants' Response is nonresponsive in that it fails to address what, if anything, Hobbie told Malcom on February 6, 2004.  Malcom asserts that, after Hobbie informed her of the reasons for the action, she explained why she had changed the times on the running order and mentioned that she had informed Norris of her intended actions.

According to Malcom, after receiving the February 6, 2004, memorandum, she "was confused concerning when [she] was expected to

remain at home." <u>Malcom Aff.</u>, ¶ 42.  She also had previously scheduled

medical appointments on Monday, February 9, 2004.  <u>Id</u>.  Malcom avers

that she asked Hobbie what she should do and he was non-committal.

Defendants assert that Malcom delayed her appointment with Dr. Bansal

without receiving permission from Hobbie.  The record is unclear on this

point.  The February 6, 2004, memorandum indicates that Malcom's

appointment with Dr. Bansal was to be on Wednesday, February 11, 2004,

at 2:00 p.m. and that she was to see McAvoy with the City's Employee

Assistance Program on Monday, February 9, 2004.  Malcom avers that she

was informed that she had been assigned to see Dr. Bansal on Monday,

February 9, 2004, but because of the previously scheduled medical

appointments, she contacted Bansal's office "and rescheduled [her] Monday

medical appointment to the following Wednesday, a delay of approximately

48 hours." <u>Malcom Aff.</u>, ¶ 42.  Defendants' exhibits contain an undated

letter from Hobbie to Malcom regarding the appointment with Dr. Bansal

which indicates that the appointment was adjusted in time only, from 2:00

p.m. to 11:00 a.m. on February 11, 2004.  <u>See</u> <u>Defendants' Memorandum</u>,

Attachment 6, p. 20, Exhibit 26.  Records from Dr. Bansal's office indicate

that Bansal examined Malcom on February 11, 2004.  Thus, it appears from

the record that the appointment was not delayed by Malcom.

It is undisputed, however, that Dr. Bansal's office did experience a delay in gathering Malcom's medical and psychiatric records. According to Malcom, she signed a medical release at Bansal's office on the day of her examination, which was by all accounts February 11, 2004. Malcom avers that she later discovered that the employee who sent out the requests for release failed to notarize Malcom's signature or complete the form, which caused some of Malcom's medical providers to refuse to provide information. According to Malcom, she contacted Dr. Bansal's office and indicated a willingness to sign another release, but the office did not prepare another release for her to sign.

As of March 8, 2004, Dr. Bansal was still in need of records from two sources. Hobbie sent an undated letter to Malcom on March 15, 2004, or later. In the letter, Hobbie indicated that Malcom had spoken with Assistant Corporation Counsel Frank Martinez on March 15, 2004, and that Malcom had informed Martinez that she would not authorize the release of all of her medical records. See Defendants' Memorandum, Attachment 6, p. 22, Exhibit 28. According to the letter, Malcom told Martinez that the City would have to determine which medical records it

wanted, to which Martinez responded that Bansal wanted all of Malcom's medical records. In the letter, Hobbie requested that Malcom release all of her medical records to Dr. Bansal by March 22, 2004. Hobbie cautioned that disciplinary action would be initiated against Malcom should she fail to comply. Id.

Hobbie sent a memorandum to Malcom, dated March 26, 2004, which indicated that Dr. Bansal had not yet received all of the medical records. See Defendants' Memorandum, Attachment 6, p. 23, Exhibit 29. The memorandum provided as follows:

> You are hereby directed to release and ensure delivery of all medical records requested by Dr. Bansil [sic] to his office by 4:30 p.m. March 31, 2004. Failure to comply with this directive will result in disciplinary action up to and including termination. Dr. Bansil [sic] has been waiting six weeks for these medical records.

Id. According to Malcom, her psychotherapist informed her that the release from Dr. Bansal's office was too broad. Dr. Bansal's office never sent a more specific request. However, Malcom avers that, eventually, the psychotherapist, through her employer, the Springfield Clinic, prepared a release that they felt complied with applicable law. Malcom signed the release and, based on that, the psychotherapist released the information to

Dr. Bansal.

In a letter to the City dated April 5, 2004, Dr. Bansal indicated that, after examining Malcom and reviewing her medical records, it was his opinion that she should be referred for a psychiatric fitness for duty evaluation.  See Defendants' Memorandum, Attachment 6, p. 16, Exhibit 23.  On April 8, 2004, Hobbie sent a memorandum to Malcom directing her to attend a psychiatric examination as scheduled by Dr. Bansal's office.  See Defendants' Memorandum, Attachment 5, p. 39-40, Exhibit 15.  The April 8, 2004, memorandum indicated that Hobbie was concerned about Malcom's fitness to perform her job based on: (1) the October 2003, mistake and Malcom's reaction when it was discussed before the Training Committee in November 2003; (2) the January 18, 2004, error and the fact that, after Norris pointed it out to Malcom, she changed filed records relating to the incident; and (3) Malcom's reaction during the February 4, 2004, conversation about Duke's return.  The memorandum concluded that the goal of the fitness for duty examination was to ascertain Malcom's ability to fulfill the duties of her position given her emotional state, frequency of errors, covering up of her error, the potential that she could commit an error that would place fellow employees in danger, and

"indicating that [her] fellow employees, management and [Hobbie] were out to get [her]." Id., p. 40.

Dr. Bansal referred Malcom to Dr. Terry Killian, a psychiatrist. Malcom met with Dr. Killian on April 14, 2004, and Dr. Killian reviewed records forwarded by Dr. Bansal.  Hobbie also forwarded a copy of his April 8, 2004, memorandum to Killian with a cover memorandum.  See Defendants' Memorandum, Attachment 6, p. 10-13, Exhibit 20.  In a letter dated April 19, 2004, Killian informed Dr. Bansal that, in his opinion, Malcom's depression and anxiety "are improved to the point where her depression and anxiety are not sufficient to make her unfit for duty in her job." See Defendants' Memorandum, Attachment 6, p. 17-18, Exhibit 24. Killian indicated that Malcom could return to her job without restriction. Killian strongly recommended, however, that Malcom "continue in psychiatric treatment and that further adjustments be made in her medication in order to get her anxiety under the best possible control." Id., p. 18.

By memorandum dated April 28, 2004, Hobbie informed Malcom that she was directed to return to work on April 29, 2004.  See Defendants' Memorandum, Attachment 6, p. 19, Exhibit 25.  According to Malcom, she

returned to work in early May 2004.  Malcom avers that, during May and June 2004, she occasionally worked as a system operator.  Malcom further asserts that, during this time period, no mistakes were brought to her attention.  Malcom, however, has presented a copy of an e-mail from Anker to Hobbie from which it appears that the two had begun documenting what they termed "events" or "incidents" relating to Malcom.  Plaintiff's Opposition, Attachment 13, p. 8-9, Exhibit 12.

In 2003, the Department put into effect a Utility Automation Information system (UAI).  UAI was a computerized system which mapped the Department's electric distribution system.  Malcom received training on the UAI in June 2003.  Malcom characterizes the UAI as "redundant," while Defendants characterize it as a "parallel" system.  It is undisputed that, by the summer of 2004, system operators were to enter switching changes into the UAI, although the prior manual system for entering switching changes was still in place.  Malcom asserts that it would not create a safety danger in the event a switching change were not entered into the UAI based in part on the fact that the manual system was still in place.  According to Malcom, in June and July 2004, the process of recording switching changes in the UAI was new.  Malcom avers that it was fairly common for system operators

to overlook entering changes on the UAI. Defendants assert, however, that such omissions were never brought to Hobbie or Seipel's attention.

In July 2004, Malcom worked as a system operator on the 1:00 p.m. to 9:00 p.m. shift. Norris worked as a system operator on the following shift. During a span of two to three days in July 2004, Malcom failed to enter switching changes into the UAI on five orders. The parties dispute whether these errors created a safety concern. It is undisputed, however, that the failure to enter switching changes into the UAI causes the UAI to contain inaccurate switch states and connectivity. Norris discovered these mistakes by Malcom and notified Hobbie of them in a detailed e-mail on July 22, 2004. Norris did not bring the errors to Malcom's attention.

On July 23, 2004, when Malcom arrived to work her 1:00 p.m. shift, Hobbie informed her that he was removing her from relief status. When Malcom asked Hobbie why, he stated that she had made a series of mistakes and, further, that he had heard that she said that she would not make entries into the UAI until she received training. Malcom denied that she made such a statement and asked to see her errors. According to Malcom, Hobbie refused to describe her errors in detail or provide documentation of them at that time. It is undisputed that Hobbie was the person who made

25

the decision to remove Malcom from relief status at this point.  Plaintiff's Opposition, p. 26, Additional Material Fact No. 123; Defendants' Reply, p. 38.  In an e-mail sent at 11:26 a.m. on July 23, 2004, Hobbie informed Anker, Seipel, Martinez, and others that Malcom was "not to perform any switching duties, sit as the Operator, or cover any shift vacancies until further notice."  Plaintiff's Opposition, Attachment 13, p. 10, Exhibit 13.  At 11:31 a.m., Seipel sent an e-mail indicating that Malcom would be removed from relief status that afternoon and that Hobbie and Seipel would be recommending discipline early the next week.  Plaintiff's Opposition, Attachment 13, p. 11, Exhibit 14.  Seipel testified in his deposition that he, Hobbie, and the sitting dispatchers each had authority to remove individuals from relief status.  Malcom was removed from relief status from July 23, 2004, to July 29, 2004.

The Training Committee met on July 28, 2004, and discussed, among other things, Malcom's five switching errors related to the UAI.  See Defendants' Memorandum, Attachment 7, p. 23, Exhibit 41.  The Committee concluded that Hobbie should schedule a meeting with Malcom to discuss the problems.  Id.  In a memorandum dated July 28, 2004, Hobbie explained to Malcom that she was removed from relief status due

to "an unacceptable number of switching errors in Utility Center on switching orders entered . . . ." <u>Defendants' Memorandum</u>, Attachment 7, p. 3, Exhibit 36.  Additionally, Hobbie wrote that he "heard from other Operations personnel that a statement may have been made to another Operator that you were not performing switching in Utility Center because you had not been properly trained;" however, after investigating the situation, Hobbie concluded that Malcom did not make such a statement. <u>Id</u>.  According to the memorandum, Malcom had informed Hobbie in their meeting that other employees were regularly making mistakes.  In the memorandum, Hobbie asked Malcom to immediately bring such mistakes to his attention, as well as the attention of the sitting dispatcher.  Hobbie also asked Malcom to provide him with any documentation she may have of past mistakes.  <u>Id</u>.  On July 29, 2004, Hobbie sent an e-mail to Anker, Seipel, Martinez, and others indicating that Malcom was available to work as an operator without limitations on her relief status.  <u>Defendants' Reply</u>, Attachment 4, p. 8, Exhibit 4.  Malcom filed the instant Complaint in September 2005.

<u>ANALYSIS</u>

Malcom asserts that Seipel, Hobbie, Anker and Norris denied her

equal protection when they subjected her, but not Brown and Brandon, to adverse employment actions.  Defendants seek summary judgment on all of Malcom's claims.  Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  A genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  The moving party has the initial burden of demonstrating the absence of a genuine issue of material fact and that judgment as a matter of law is appropriate.  Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986).  When a properly supported motion for summary judgment has been made, the party opposing summary judgment may not merely rest on the pleadings but must "set out specific facts showing a genuine issue for trial."  Fed. R. Civ. P. 56(e)(2).  "A party must present more than mere speculation or conjecture to defeat a summary judgment motion."  Liu v. T & H Machine, Inc., 191 F.3d 790, 796 (7th Cir. 1999).  The Court must consider the evidence in the light most favorable to the non-moving party, here the Plaintiff, and draw all

reasonable inferences in her favor.  See Anderson, 477 U.S. at 255.

Malcom's equal protection claim is analyzed under the same standards as a Title VII claim.  See Hildebrandt v. Illinois Dept. of Natural Resources, 347 F.3d 1014, 1036 (7th Cir. 2003).  Malcom may use either the "direct" or "indirect" methods of proof to support her claim.  Malcom asserts that she can avoid summary judgment under the indirect method of proof set out in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).  Under that method, Malcom must establish a prima facie case of discrimination by producing evidence that she: (1) is a member of a protected class, (2) was meeting her employer's legitimate performance expectations, (3) suffered an adverse employment action, and (4) was treated less favorably than similarly situated individuals outside of her class.  Ballance v. City of Springfield, 424 F.3d 614, 617 (7th Cir. 2005).  If Malcom establishes a prima facie case, the burden of production shifts to Defendants "to provide a legitimate, nondiscriminatory reason for the decision."  Id.  If Defendants satisfy this burden, the burden shifts back to Malcom to show that Defendants' explanation was pretextual.  Id.  The showing of "[p]retext requires more than showing that the decision was mistaken, ill considered or foolish, [and] so long as [the employer] honestly believes those reasons, pretext has not

been shown." Id. (internal quotations and citation omitted).   Pretext "means a dishonest explanation, a lie rather than an oddity or an error." Id. (internal quotations and citation omitted).

Malcom is female and, thus, she satisfies the first element of her prima facie case.  In order to focus on the relevant evidence, the Court turns next to the third prong of the prima facie case, which requires Malcom to produce evidence of an adverse employment action.  Malcom asserts that she suffered adverse employment actions: (1) in February 2004, when she was placed on involuntary administrative leave and (2) in July 2004, when she was removed from relief status.  The Seventh Circuit defines "adverse employment action" broadly; however, the Court recognizes that "not everything that makes an employee unhappy is an actionable adverse action." Lewis v. City of Chicago, 496 F.3d 645, 653 (7th Cir. 2007). Under Seventh Circuit precedent, "[f]or an employment action to be actionable, it must be a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibility, or a decision causing a significant change in benefits." Id.

Turning first to the February 2004 incident, it is undisputed that Malcom was given her standard pay and benefits during the administrative

leave.  The Seventh Circuit has recently held that an employer's placement of an employee on paid administrative leave pending the results of a fitness-for-duty psychological examination does not constitute a materially adverse action.  Nichols v. Southern Illinois University-Edwardsville, 510 F.3d 772, 786-87 (7th Cir. 2007).  The Court recognizes that Malcom filed her Opposition prior to Nichols being decided.  Additionally, Malcom's case is distinguishable from Nichols in that Nichols did not claim that his position, salary, or benefits were impacted by the paid administrative leave.  As Malcom points out, during her administrative leave, she lost the opportunity to work as a system operator and earn the higher wage associated with that position.

Defendants respond that Malcom did not suffer any material consequence while on administrative leave because the opportunity to work as a system operator was "speculative at best."  Defendants' Reply, p. 40.  In July 2007, the Seventh Circuit addressed a similar argument relating to the loss of potential for overtime pay in Lewis v. City of Chicago.  Lewis, 496 F.3d at 645.  Lewis, a female Chicago Police Officer, qualified for assignment to a special detail in Washington, D.C., which involved providing police protection during anticipated demonstrations relating to an

International Monetary Fund meeting.   She was not allowed to go, proportedly because her unit did not have another qualified female officer who wished to attend and thus, housing issues prevented Lewis from the assignment.   Lewis filed suit under Title VII, alleging that the decision to deny her the special assignment constituted sex discrimination.   Lewis claimed that she suffered adverse employment actions in the form of the loss of two days of overtime pay, totaling approximately $1,000.00, and the loss of the experience of training on the IMF Detail that she characterized as a once-in-a-lifetime training event.

The Lewis Court noted that, under Seventh Circuit authority "a denial of a raise can be an adverse employment action while the denial of a 'more transient' payment such as a bonus is not." Lewis, 496 F.3d at 653 (citing Barricks v. Eli Lilly and Co., 481 F.3d 556, 559 (7th Cir. 2007)).  The Court cautioned that the relevant inquiry is whether a material, sufficiently important alteration of the employment relationship occurred.  The Lewis Court found that, depending on the type of work, overtime could be a significant and recurring part of an employee's total earnings akin to a raise or it could be insignificant and nonrecurring like a discretionary bonus.  In Lewis, the Court held that the loss of potential to earn many hours of

overtime, coupled with lost opportunity to experience a specific type of work, constituted an adverse employment action.  Id. at 654.

In the instant case, it is clear that, by February 2004, Malcom had been filling Duke's system operator position for approximately eight months.  This certainly rises above a mere speculative opportunity to work as a system operator and thus earn a higher pay rate.  Moreover, while Defendants assert that Brown and Brandon would also have the opportunity to compete for system operator shifts, it is undisputed that Malcom was senior to each of these men and thus had the first opportunity to fill system operator vacancies.  Although the pay differential between a system operator and an Operator Trainee III is less than $2.00 an hour, over a large amount of hours, the amount becomes more substantial.  Additionally, the Court does not believe that the time period of the administrative leave can be characterized as trivial.  Malcom was on administrative leave from February 6, 2004, through April 29, 2004, a period of almost two months.  Defendants assert that much of this time period was attributable to Malcom.  However, a question of fact exists as to whether Malcom's conduct delayed the production of medical records or whether the delay was caused by deficiencies in the release that was sent out by Dr. Bansal's office.

At summary judgment, the Court must resolve this dispute in Malcom's favor.  The Court recognizes that, unlike the plaintiff in <u>Lewis</u>, there is no evidence in the record that Malcom's leave had any effect on her ability to fully experience any aspect of her career.  After Malcom returned from leave, she apparently was returned immediately to relief status and had the opportunity to occasionally work as a system operator in the following months.  However, considering all of the relevant factors, the Court finds that, at this stage, Malcom has presented evidence sufficient to withstand summary judgment on the issue that the February 2004, administrative leave constituted an adverse employment action.

The July 2004, incident is similar.  In July 2004, Malcom was working as a system operator on a regular basis, when Norris discovered her failure to enter switching changes.  Malcom has again demonstrated more than a mere speculative opportunity to work as a system operator.  Malcom was removed from relief status for at least six days, a period that the Court deems significant under the Seventh Circuit's reasoning in <u>Lewis</u>.  The Court finds that Malcom has presented sufficient evidence that the July 2004, removal from relief status constituted an adverse employment action.

To complete her prima facie case, Malcom must establish the second

and fourth prongs as well.  To do so, Malcom must present evidence that she was meeting her employer's legitimate performance expectations (second element) and that she was treated less favorably than similarly situated individuals outside of her class (fourth element).  The Court finds that Malcom has presented sufficient evidence to establish the second prong with respect to the February 2004, incident.  Malcom, however, is unable to establish the fourth element based on the February incident.  As it relates to the July 2004, incident, Malcom's case fails on both of the second and fourth prongs.

Malcom attempts to establish the second element of her prima facie case, satisfactory job performance, by presenting evidence from seven Department employees regarding her performance.  The relevant inquiry requires the Court to examine Malcom's job performance through the eyes of her supervisors at the time of the adverse employment actions.  See Gates v. Caterpillar, Inc., 513 F.3d 680, 689 (7th Cir. 2008).  Under this standard, much of the evidence proffered by Malcom becomes irrelevant.

Two of the employees upon whom Malcom relies, Bob Baker and Terry Byrd, are crew foreman.  Mike Hanselman was a crew foreman who later became a maintenance supervisor.  These three men thought that

Malcom performed her job as well as anyone else.  None of these men, however, had frequent contact with Malcom or had any knowledge of her alleged mistakes at issue in the instant case or any reason to know of these mistakes.  Malcom also points to Dave Hergett, a troubleshooter, as an individual supporting her case.  Troubleshooters work in the field and communicate with system operators by radio.  According to Hergett, he works with all system operators and relief system operators and has been involved in a situation where a system operator made a mistake.  Hergett worked with Malcom and had no concern about her work.  Hergett, however, had no knowledge of Malcom's mistakes at issue in the instant case or any reason to know of them.  It is undisputed that Baker, Byrd, Hanselman, and Hergett had no supervisory responsibilities relating to Malcom.

Malcom further asserts that the testimony of system operator Gerald Stone supports her claim of satisfactory work performance.  System operators filled out periodic evaluation forms for relief system operators when working with them and, according to Stone, operators should note any mistakes that a relief system operator makes in the evaluation so that it can be dealt with by management.  Stone worked with Malcom, Brown, and

Brandon, and considered them to perform their jobs equally.  Stone testified, however, that Malcom had the "hottest" temper of the people that he worked with as a system operator.  <u>Plaintiff's Opposition</u>, Attachment 12, p. 8-9, <u>Stone Dep.</u>, p. 32-35.  Stone stated that a hot temperament was not a desirable trait for a system operator because of the need to focus during the job.  <u>Stone Dep.</u>, p. 43.  Stone personally observed Malcom yelling at Duke, Brandon, Brown, Beers, and others during work.  The record reflects that Stone worked regularly with Malcom and worked with her on a training basis when she returned from administrative leave in April 2004; however, there is no indication that he was aware of or involved in any of the incidents of alleged mistakes in the instant case.

Malcom also identifies Dispatcher Bill Beers and Dispatcher Dan Godiksen as individuals supporting her claim of satisfactory job performance.  It is clear from the record that dispatchers serve as shift supervisors in the Division of Electric Distribution.  Both Beers and Godiksen worked with Malcom.  Beers does not recall any mistakes by Malcom that he felt the need to relay to Hobbie, nor did he notice Malcom making a pattern of mistakes on orders.  Beers felt that Malcom, Brown, and Brandon were all very capable.  Godiksen became aware of a significant

switching mistake by Brown and informed Hobbie of it.  According to Godiksen, he never had concerns about Malcom that he felt should be raised with Hobbie.  Despite this distinction, Godiksen testified that Brown, Brandon, and Malcom were equally qualified.

With respect to the February 2004 action, the Court finds this evidence, viewed in the light most favorable to Malcom, is sufficient to establish that Malcom was performing her job satisfactorily at the time she was placed on administrative leave.  Stone, Beers, and Godiksen each worked regularly with Malcom on a supervisory basis and had no concerns about her job performance.  Their opinion that Brown, Brandon, and Malcom were equally qualified or capable of performing the duties of an Operator Trainee III with relief status creates a question of fact as to the quality of Malcom's job performance.  Moreover, questions of fact exist with respect to the propriety of Malcom's conduct as it related to the Val-E-Vue incident.  The record reflects that, in severe situations, running orders may omit clearance time.  Additionally, there is no evidence of a Department policy which precludes correcting filed documentation and, viewing the evidence in the light most favorable to Malcom, Norris expressed no concern when Malcom told him that she intended to alter the paperwork to correct

the discrepancy.

Turning to the July 2004, removal of Malcom's relief status, Malcom concedes that by the summer of 2004 she was supposed to enter the information into the UAI. She failed to do so on numerous occasions within a short time frame. Malcom disputes that the errors caused any safety risk, but this does not negate the fact that errors were indeed made. There is no specific evidence that any other individual made similar errors or that any such errors were brought to the attention of Malcom's supervisors. Therefore, Malcom fails to identify evidence that she was performing her job satisfactorily in the eyes of her supervisors in July 2004. She cannot establish the second necessary element of her prima facie case as it relates to this incident.

The Court proceeds to the fourth prong, which requires Malcom to identify evidence of similarly situated males who were treated more favorably. Malcom fails to do so with respect to either the February 2004, action or the July 2004, removal of her relief status. Thus, summary judgment is appropriate at this stage. Malcom asserts that the mistakes that she made prior to being placed on administrative leave in February 2004, were no more serious than the mistakes made by Tim Brown between the

summer of 2003 and February 2004. Malcom further asserts that Brown was going through a "fairly contentious" divorce during this period and that Brown's marital problems "were relatively well known among individuals who were working at [Malcom's] facility." Malcom Aff., ¶ 26. Defendants contend that Brown was not similarly situated. To succeed on the fourth prong, Malcom need not show that other employees are explicitly identical to herself, a "hyper-technical approach" against which the Seventh Circuit has repeatedly cautioned. Gates, 513 F.3d at 690 (collecting cases). Malcom must however "at least show that these men dealt with the same supervisor, were subject to the same standards, and had engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them." Id. (internal quotations and citations omitted).

At the outset, the Court notes that, while Brown may have been experiencing a contentious divorce, there is no evidence that any problems he experienced relating to the divorce manifested themselves at work. Malcom, on the other hand, became visibly upset when Hobbie informed her of Duke's return in February 2004, and voiced an opinion that Hobbie was out to get her. Moreover, approximately one year earlier, Malcom had

removed herself from relief status when her personal activities began to interfere with her work.  Assuming that Malcom and Brown made similar types of errors from mid-2003 through February 2004, the record reveals a distinction in how they dealt with such errors.  There is no evidence that Brown ever changed filed documentation or that he tried to focus on the errors of others when being counseled about his own mistakes.  It is also significant to note that the purpose of Malcom's February 2004, administrative leave was to allow for a fitness for duty examination, based not only on performance errors, but also on the behavior that Malcom displayed at work.  There is no evidence that any other employee, male or female, displayed similar behavior to Malcom, yet was not sent for a fitness for duty examination.  Malcom has failed to show that Brown or any other male employee was similarly situated with respect to the February 2004, leave.

With respect to the July 2004, removal of her relief status, the Court notes that Malcom fails to identify evidence of any specific person, including Brown or Brandon, who engaged in similar conduct regarding the UAI.  Malcom avers that in June and July 2004 "[i]t was fairly common for system operators, because of large volume of switching changes being made,

to overlook entering changes on the UAI." <u>Malcom Aff.</u>, ¶ 52.  This generalization is insufficient to avoid summary judgment, and there is no evidence that Hobbie knew that this was occurring.  Moreover, the Court notes that, to the extent Malcom is using "system operator" as a job title, there is no evidence that individuals who are system operators are similarly situated to individuals, such as Malcom, who are on relief status.  Thus, Malcom fails to establish her prima facie case with respect to either the February 2004, administrative leave or the July 2004, removal of her relief status.  Summary judgment is appropriate on all four counts.

Furthermore, even if Malcom could establish a prima facie case of discrimination, summary judgment in favor of Defendants is nevertheless appropriate because Malcom has failed to present any evidence to support a finding of pretext.  "A pretext . . . is a deliberate falsehood." <u>Forrester v. Rauland-Borg Corp.</u>, 453 F.3d 416, 419 (7th Cir. 2006).  The Seventh Circuit instructs as follows:

> A plaintiff may show pretext with evidence that the employer's explanation is not credible.  In this regard, an employee may show that the employer's reason had no[ ] basis in fact, that the explanation was not the real reason for its action or that the reason stated was insufficient to warrant the adverse job action.  The main inquiry in determining pretext is whether the employer honestly acted on the stated reason rather than

whether the reason for the [adverse employment action] was a correct business judgment.

Atanus v. Perry, 2008 WL 696908, * 8 (7th Cir. Mar. 17, 2008) (internal quotations and citations omitted).  "[I]t is not the court's concern that an employer may be wrong about its employee's performance, or be too hard on its employee. Rather, the only question is whether the employer's proffered reason was pretextual . . . ."  Gates, 513 F.3d at 691 (internal quotations and citations omitted).

Defendants explain that Malcom was placed on administrative leave in February 2004, because of poor work performance and an obviously fragile mental state.  Defendants adopt the specific reasons set out in Hobbie's April 8, 2004, memorandum to Malcom and his April 13, 2004, memorandum to Dr. Killian, which are as follows: (1) the October 2003, mistake and Malcom's reaction when it was discussed before the Training Committee in November 2003; (2) the January 18, 2004, error and the fact that after Norris pointed it out to Malcom, she changed filed records relating to the incident; and (3) Malcom's reaction during the February 4, 2004 conversation about Duke's return.  This is a legitimate, non-discriminatory explanation for the decision to place Malcom on

administrative leave pending a fitness for duty evaluation. Thus, the burden shifts back to Malcom to show that the proffered reason is false and a pretext for discrimination.

Malcom asserts that a reasonable trier of fact could question Defendants' explanation behind the February 2004, leave because: (1) the proffered reasons were not set out until over sixty days after Malcom was placed on leave, (2) the October 2003, error and November 2003, Training Committee meeting were distant in time to the removal, (3) Malcom did not err in the running order relating to the Val-E-Vue incident and did not violate any established policy when she changed filed records, and (4) Hobbie allowed her to work the remainder of the February 4, 2004, shift. As an initial matter, the Court notes that Malcom herself admits that at the time she received the February 6, 2004, memorandum, she asked Hobbie why she was being placed on leave and he responded it was because of the Val-E-Vue incident and the February 4, 2004, conversation. Thus, there is no evidence that these reasons surfaced long after the decision to place Malcom on leave. With respect to the timing or gravity of her alleged errors, it is not for the Court to sit as a super-personnel department reviewing the accuracy of an employer's business decisions. It is undisputed

that Malcom made a mistake in October 2003, and the record reveals that, when lectured about it, she expressed more concern over a mistake that she had discovered that had been made by Brown.  It is also clear that the paperwork relating to the Val-E-Vue incident contained inconsistent times. It is undisputed that, after this inconsistency was brought to Malcom's attention, she retrieved the filed records and made changes to them. Finally, the Court notes that the undisputed evidence reveals that, while Hobbie allowed Malcom to work a half shift as a system operator after the February 4, 2004, conversation, Hobbie specifically knew that no crews were working that evening and, prior to leaving, Hobbie asked Beers to monitor Malcom's behavior during the shift.  Malcom fails to identify a question of fact on the issue of pretext as it relates to the February 2004, leave.

Defendants assert that Hobbie's decision to remove Malcom from relief status in July 2004, was based on Malcom's failure to enter switching orders into the UAI together with Hobbie's belief that Malcom had stated that she would not enter information into the UAI absent further training. Again, Defendants have provided a legitimate, non-discriminatory explanation for the decision, shifting the burden back to Malcom to show

that the proffered reason is false and a pretext for discrimination.  Malcom asserts that a reasonable trier of fact could question this explanation because: (1) the UAI system was new and others had the same adjustment problems as Malcom, (2) the failure to enter switching orders into the UAI did not create a safety concern because the manual system was still in place, (3) Hobbie did not explain Malcom's mistakes to her when he removed her from relief status, (4) her mistakes were not corrected, and (5) Norris failed to bring Malcom's mistakes to her attention as was common practice in the Department.  None of these facts create a triable issue on the question of pretext.  Malcom does not deny that she failed to enter information into the UAI.  Significantly, while Malcom alludes to similar errors by others, there is no evidence that Hobbie knew of any other employees making switching errors in the UAI.  Nor is there any evidence that Hobbie erred in relying in part on information concerning an alleged statement by Malcom that she would not enter information into the UAI until she received further training.  Hobbie followed up by asking the operator in question and, by July 28, 2004, he had determined that Malcom did not make such a statement.  There is, however, no indication that Hobbie knew or should have known that Malcom made no such statement at the time he removed

her from relief status.  Malcom fails to identify a question of fact on the issue of pretext as it relates to the July 2004, removal of her relief status. Thus, summary judgment on all counts is appropriate at the pretext stage as well.   Because Malcom has not established sufficient proof of discrimination, it is unnecessary for the Court to address Defendants' claim that they are entitled to qualified immunity.

Furthermore, to survive summary judgment, a plaintiff claiming a violation of § 1983 must produce evidence that the defendant knew of a deprivation and "approved it, turned a blind eye to it, failed to remedy it, or in some way personally participated." Johnson v. Snyder, 444 F.3d 579, 584 (7th Cir. 2006) (internal quotations and citation omitted). Absent direct participation, there must at least be a showing that the defendant "acquiesced in some demonstrable way" in the alleged violation.  Palmer v. Marion County, 327 F.3d 588, 594 (7th Cir. 2003).  At all relevant times, Defendant Norris was a system operator and Defendant Anker was a dispatcher.  These two Defendants served on the Training Committee, and the record reflects that they both reported what they believed to be errors by Malcom to Hobbie.  There is, however, no indication that Anker, Norris, or the Training Committee were involved in the decision making process for

either the February or July 2004, incidents.  The record is clear that Defendants Seipel and Hobbie made the decision to place Malcom on administrative leave in February 2004, pending a fitness for duty evaluation. It is also clear that Hobbie alone made the decision to remove Malcom from relief status in July 2004, although Seipel clearly concurred in the decision. Seipel was the Superintendent of Electric Transmission and Distribution and Hobbie was the manager of the Electric Operations Division.  Both men were superior to Anker and Norris.  Malcom has failed to produce evidence of sufficient personal involvement by either Norris or Anker.  Therefore, summary judgment in favor of Defendant Anker on Count III and Defendant Norris on Count IV is appropriate on this basis as well.

THEREFORE, for the reasons set forth above, the Motion for Summary Judgment (d/e 43) is ALLOWED.  Judgment is entered in favor of Defendants Greg Seipel, Eric Hobbie, Alisha Anker, and Scott Norris and against Dianna Malcom.  All pending motions are denied as moot.  This case is closed.

IT IS THEREFORE SO ORDERED.

ENTER:   March 20, 2008

FOR THE COURT:

_____s/  Jeanne E. Scott_____
JEANNE E. SCOTT
UNITED STATES DISTRICT JUDGE